## NOBLE H. HILL *v.* E. A. NORTH.

### *Principal and Agent. Breach of Warranty. Evidence.*

When one is not merely a messenger for the principal to receive proposals for a trade, but fully negotiates a trade and pays part of what is to be the price, if the principal approves the trade, and the bargain is completed by the principal substantially upon the terms the agent has thus agreed upon, the principal will stand charged with knowledge of whatever was communicated to such agent in the course of the negotiation.

A general warranty does not cover defects that are perfectly visible and obvious to the senses, and known to the party taking the warranty.

Where it was conceded that the defect complained of, so far as it was obvious and visible, was known to the purchaser or his agent, but it appeared that the seller represented that it did not injure the horse or affect him in the slightest degree, and the purchaser or his agent did not believe and had no reason to believe the defect was anything more than a mere blemish which would never render the horse less useful or capable of service; and the testimony tended to prove that in point of fact the defect was a real unsoundness at the time of the sale; it was *held,* that this was one of those equivocal defects that a warranty may well be considered as taken to guard against.

The rule excluding from a warranty such defects as are known to the purchaser, only applies to such as are perfectly obvious to the senses, and the effects and consequences of which may be accurately estimated, so that no purchaser would expect the seller-intended; to warrant against them; but all other defects, though apparent to some extent, but still equivocal and doubtful in their character, as to whether they are permanent or temporary, or mere harmless blemishes, or but partially developed unsoundness, must be understood to be included and covered by a general warranty.

A witness may state what a third person said, for the purpose of identifying a particular occasion or date.

ACTION ON THE CASE for the breach of a written warranty in the sale of a horse. Plea, the general issue and trial by jury, June term, 1860, Addison County, PIERPOINT, J., presiding.

On trial the plaintiff gave in evidence a written instrument, signed by the defendant, of which the following is a copy:

" Bridport, Vermont, May 21, 1857.

Noble H. Hill, Boston, Mass.,

        Bo't of E. A. North,

              Champlain, New York,

A Black Hawk Stallion, called "*Rip Van Winkle,*" which will

be five years old July 18, 1857, and which I warrant sound and kind in every respect, for $2750.00.

Received twenty-seven hundred and fifty dollars.

E. A. NORTH.

May 21st, 1857."

The plaintiff's evidence further tended to prove that David Hill, the father of the plaintiff, who resided at Bridport in this state, at some time previous to the date of the above written instrument, went to Champlain, New York, where the defendant resided, and, as agent of the plaintiff, entered into negotiations for the purchase of the horse in question; that he arrived there late on Saturday evening, and on the following day saw the horse and made some slight examination of him, and noticed the quarter cracks hereafter mentioned, and a small bunch on the knee joint of the right fore leg; also that he saw the horse rode and driven near evening, when it was too dark for a close examination; that after considerable debate the defendant offered to sell the horse for twenty-seven hundred and fifty dollars; that said David, as agent for the plaintiff, thereupon gave the defendant fifty dollars, and agreed with him to bring the horse to Bridport on a subsequent day, where the plaintiff would meet him, and then, if the plaintiff should conclude to buy the horse, he would pay the defendant money enough to make, with the fifty dollars advanced, the sum of one thousand dollars, and would give such notes for the balance as the plaintiff and defendant might agree upon; that if the plaintiff did not trade for the horse the defendant might retain the fifty dollars so advanced for his trouble in bringing the horse to Bridport; that on the 21st day of May, 1857, the defendant brought the horse to Bridport, where he met the plaintiff for the first time who then closed the bargain at the price of twenty seven hundred and fifty dollars, and paid nine hundred and fifty dollars in money, and gave satisfactory notes for the balance, and that thereupon the defendant executed the bill of sale and warranty above set forth; that on this occasion the plaintiff remained at Bridport but a short time—not more than an hour—and made little or no examination of the horse, returning the same day to Boston, where he resided.

The plaintiff's evidence further tended to prove that the horse, after the sale and purchase, was left by him with David Hill; that within a day or two after the sale David Hill discovered on the two hind feet of the horse, what are termed cling-fasts, or ring-bones, and also an enlargement of one of the gambrel joints; and the plaintiff gave other evidence tending to prove the existence of these ring-bones and this enlargement of the gambrel joint at the time of the sale, and that each of these constituted an unsoundness.

The plaintiff's evidence also tended to prove that the quarter-cracks before mentioned constituted unsoundness in the horse; but, in respect to these quarter-cracks, it was proved that at the time of the negotiation and trade they were spoken of by David Hill and the defendant, and David Hill testified that he·said to the defendant he did not care much about them as they could be cured, and it appeared that they were cured within a year after the sale.

The plaintiff's evidence also tended to show that the bunch upon the right fore leg was an unnatural deposit of bone, which some of the witnesses called a splint, and that it constituted an unsoundness at the time of the sale, and that both of these defects last named materially lessened the value of the horse.

As to the bunch on the fore leg, the plaintiff introduced as a witness Dr. Dadd, a veterinary surgeon, who testified that he saw the horse first in September, 1858, and again in December, 1859; that the excrescence on the fore leg was of a bony or cartilaginous character, and as such would constitute an unsoundness; that it was about as large as the half of a walnut, and he thought had increased in size some from 1858 to 1859; that it might have been the result of an accident, and might interfere with the free action of the knee joint. David Hill testified that there was a bone projecting from the knee of the horse; that it was on the right fore leg, and stuck out a half an inch, on the outside of the leg; that he saw and spoke of it to the defendant at the time of the negotiation at Champlain, and that the defefendant said it had always been there and did·not injure him. David Hill also testified that this bone affects the walking of the horse, and shows a weakness of the joint; that

he thought this bone did not increase in size after he was purchased, but that it might have done so a little. It was not claimed on either side that this leg was affected by any cause other than this bunch and the quarter-cracks.

The evidence further showed, and on this point was uncontradicted, that in September, 1858, the horse had large deposits of bone, of an unnatural character on his hinder feet, known as ring-bones, and a large spavin on the gambrel joint, at the points indicated in the testimony of David Hill, as stated above, but it was claimed by the defendant that these did not exist at the time of the sale.

The evidence given by the defendant in person, and other witnesses in his behalf, tended to prove that the horse was examined by David Hill at Champlain, in a much more thorough manner than stated by him; that he saw the horse rode and driven, and that the horse was also examined by one More, who was well acquainted with horses, and was taken by David Hill to Champlain for the purpose of making such examination; that David Hill had great experience and skill in regard to horses; that all the negotiations were conducted by David Hill at Champlain in his own name, and without reference to the plaintiff; that the price was there agreed upon; that the defendant agreed to deliver the horse at Bridport, where David Hill agreed to receive him, pay nine hundred and fifty dollars in money, in addition to fifty dollars which he then paid, and give notes signed either by the plaintiff, or Mr. Fletcher of Bridport, having not more than a year to run, for the balance; that the defendant understood he was contracting with David Hill as principal, and not as agent for the plaintiff, and that during the interview at Champlain nothing was said about any warranty of the horse as to soundness or otherwise; that the defendant met the plaintiff for the first time at Bridport, when he took the horse there; that the plaintiff was at Bridport when the defendant arrived there, where the plaintiff remained over night and until some time the following day, and examined the horse and noticed the quarter-cracks. There was no evidence, however, tending to show that the plaintiff ever saw or noticed the bunch upon the fore leg or any other defect or unsoundness in the horse, except

the quarter-cracks, previous to the sale. The defendant's evidence further tended to show that after the plaintiff had looked at the horse, the bill of sale of May 21, 1857, was executed, and the plaintiff paid nine hundred and fifty dollars in money and endorsed to the defendant David Hill's five notes for three hundred and fifty dollars each, for the balance, the first payable six months after date, and the others payable severally at the end of each three months thereafter; and that the papers were then exchanged.

The defendant's evidence tended also to prove that the bunch on the fore-leg and the quarter-cracks were not upon the horse when foaled, but the bunch first made its appearance when the horse was about two years old, and the quarter-cracks about a year after; that at the time of the sale, the bunch was not readily discoverable, and was about as large as a small pea, and did not at that time or ever in the slightest degree injure or affect the horse; that it was spoken of by the defendant in the presence of David Hill in the interview at Champlain, and that it was there claimed by the defendant that the same constituted no injury to the horse whatever, and it appeared that so far as the defendant knew, it did not injure him. The defendant's evidence tended further to prove that the horse was in all other respects sound at the time of the sale, and that both David Hill and the plaintiff supposed the horse sound in all other respects at the time of the sale. The evidence of the plaintiff further tended to show, that the bunch upon the fore leg and the cling fasts were unnatural deposits of a bony character, and proceeded either from some hereditary predisposition to such a disease, existing in the animal or from some straining or over exercise; that such deposits were generally slow in their growth and development; that the horse, ever after he was purchased by the plaintiff, was used in the most careful and prudent manner, and was never strained, over exercised or driven at a high rate of speed, but that on various occasions before the sale, commencing when the horse was only eighteen months old, and continuing down to the time of the sale, when he was five years old, he had been driven at a high rate of speed in sundry races and matches, as they were called, and as fast as he could possibly be driven, and'

in such a manner as was calculated to strain him. It also appeared that David Hill knew of these performances in the way of extra speed, and that the character of the horse in this respect constituted an inducement to him to purchase, and that he procured of the defendant certificates of the speed of the horse, that were subsequently published in the plaintiff's advertisements of the horse.

The evidence of the plaintiff also tended to prove that he bought the horse, as the defendant knew, for a stock horse, and that by reason of the defects and diseases above referred to, he was of little or no value to the plaintiff as a stock horse, or for any other purpose, and was not in fact worth over one hundred dollars, but that if the horse had been sound in every respect, his value would have been fully equal to the sum paid upon his purchase.

The plaintiff called Isaac Williamson for the purpose of rebutting the testimony of the defendant, as to the length of time the plaintiff was at Bridport when the sale was made, who testified that in the month of May, 1857, he let the plaintiff a horse to drive from Middlebury to Bridport and return, on which occasion he was not gone over night, nor more than three hours, (Bridport being about eight miles from Middlebury.) In answer to a question put by the defendant's counsel, the witness stated that he had let horses to the plaintiff more than once in the spring and summer of 1857, to drive to Bridport. For the purpose of identifying this as the time when the horse in question was purchased, the plaintiff's counsel offered to show that when he hired the horse on this occasion he stated that he was going to Bridport to buy the horse in question, and that on his return he stated that he had bought him. This was objected to by the defendant as hearsay and excluded by the court on that ground, to which the plaintiff excepted.

There was no evidence tending to show that the defendant at the time of the trade had any knowledge of any unsoundness in the horse, except the quarter-cracks, and bunch on the knee referred to, or any knowledge in relation to them, except such as was communicated to or known to David Hill at the time the trade was negotiated at Champlain.

40

The plaintiff requested the court, among other things, to charge the jury :

1. That the warranty being against all unsoundness, whether patent or otherwise, if the plaintiff proved to the satisfaction of the jury that *any* unsoundness existed in the horse at the time of the sale, the plaintiff was entitled to recover such damages as were occasioned by such unsoundness ; and that the warranty in the case being in writing and its execution admitted by the defendant, if the jury found that the horse had quarter-cracks and the bunch on the fore leg, as the evidence tended to prove, at the time of the sale, and that said quarter-cracks and bunch, or either of them, constituted an unsoundness, the plaintiff was entitled to recover, even though these unsoundnesses were pointed out to and observed by the plaintiff previous to the sale.

2. That the warranty covered every such unsoundness, although it may have been noticed by David Hill or the plaintiff, if the jury find that the same was not apparently an unsoundness, and that both David Hill and the plaintiff believed the defects observed, viz : the small bunch upon the knee and the quarter-cracks, were not an unsoundness.

3. That if David Hill and the plaintiff were induced so to believe from the representations of the defendant, their observation of these defects cannot limit or qualify the meaning of the warranty as covering such defects, if the same were in fact an unsoundness.

4. That although David Hill and the plaintiff may have observed these defects, and had reason to believe the same to be an unsoundness, the warranty extends to them nevertheless, if the defendant at the sale, represented and claimed that the same were not unsoundnesses, and if, in fact, either of them was an unsoundness.

5. That the evidence as to the examination of the horse made by David Hill at Champlain should be laid out of the case, as affecting the construction of this warranty.

But the court, upon other branches of the case having charged in a manner satisfactory to the plaintiff, declined to charge as requested, any farther than herein stated, but, in respect to the plaintiff's claim, that he should not be affected by any notice of

the unsoundness of the horse in question received by David Hill during the interview at Champlain, told the jury that, it being conceded that David Hill was the plaintiff's agent in making the negotiations relative to the horse at Champlain, if the jury should find that the sale was so far completed at that place, that the price of the horse, and the time and manner of payment for him were agreed upon, and the defendant promised to deliver him at Bridport, in pursuance of such agreement, and the terms of the trade were then agreed upon, as the evidence tended to prove, and the defendant and the plaintiff met at Bridport to close the contract, which had been so agreed upon at Champlain by David Hill, as the plaintiff's agent, and the trade was there consummated, and thereupon the price was paid and the horse was delivered as had been previously agreed, and the defendant then executed the bill of sale in question to the plaintiff, in that case, any notice or information in relation to the horse received by David Hill, at Champlain during the negotiations there, would affect the plaintiff in the same manner as though such notice or information had been received by himself, though he had no such notice or information in fact. But that if the negotiations at Champlain were merely preliminary, and no agreement for the sale of the horse was made there, but the terms of the sale were merely talked over there, and the contract and sale was made when the parties met at Bridport, in that case the plaintiff would not be affected by notice given to David Hill at Champlain, unless such notice was shown to have been communicated in fact to the plaintiff.

And as to the effect, which the fact, that David Hill saw the quarter-cracks and bunch upon the fore leg of the horse at Champlain, should have upon the question of the defendant's liability, the court charged in substance, that in this action the plaintiff sought to recover damages for a deceit which he claimed had been practiced upon him by the defendant; that the defendant warranted the horse to be sound; that if he was unsound at the time of the sale, proof of that fact entitled the plaintiff to recover, provided he was deceived in reference thereto in consequence of his ignorance of such unsoundness; but for the purpose of this trial the court charged, that the plaintiff could not

recover on account of the existence of any defect of which the
plaintiff was aware at the time of the sale; that although a
defect existed, if the defendant could show that the plaintiff knew
at the time of the sale, the plaintiff could not recover; that the
rules governing this case were substantially the same as they
would be if the action were for falsely and fraudulently repre-
senting the horse to be sound, (the court explaining what those
rules were,) except that in this case the plaintiff need not prove
that the defendant knew of the unsoundness, and that as no
question was made by the plaintiff but that David Hill saw the
quarter-cracks and the bunch on the fore leg during the inter-
view at Champlain, the jury would lay the consideration of the
quarter-cracks and this bunch entirely out of the case, if they
found under the charge, that the plaintiff should be affected with
such knowledge of David Hill.

The jury returned a verdict for the defendant.   To the
foregoing decision of the court, the omission of the court to
charge as requested, and to the charge as given, the plaintiff
excepted.

*Linsley & Prout*, and *D. Roberts*, for the plaintiff.

*F. E. Woodbridge* and *E. J. Phelps*, for the defendant.

POLAND, Ch. J.   We have not been furnished with a copy of
the plaintiff's declaration, but it is agreed that it is in the usual
form in case for a false warranty, under which the plaintiff
might recover by proving either a deceit, or an express warranty,
and a breach of it.   It is apparent from the exceptions, that
the plaintiff at the trial sought to establish his case wholly upon
the latter ground, and in that respect, his case was to be made
out in the same manner precisely as if his action had been
assumpsit on the contract of warranty.   The plaintiff proved a
general warranty of soundness of the horse by written agree-
ment of the defendant

The only question in issue then, was, whether the warranty
was broken; that is, whether at the time said warranty was
executed, there was an existing unsoundness in the horse, that

was covered by the warranty. The plaintiff claimed that the horse had *ringbones,* and an enlargement of the gambrel joints, at the time. The jury found these did not exist at the time of warranty, which effectually disposed of this claim.

The plaintiff claimed also that the horse was unsound at the time of warranty by reason of quarter cracks, and a bunch on one fore leg ; that these were unsoundnesses at the time, and constituted a breach of the warranty. The defendant admitted the existence of both these defects at the time, but denied that either amounted to an unsoundness, but if either of them was so, claimed that it was not covered by the warranty, for the reason that it was fully known and understood by the plaintiff or his agent when the warranty was made. The court charged the jury, that if the trade was made for the horse with the defendant by David Hill, as agent for the plaintiff, then the plaintiff could not recover on account of these defects, as it was conceded that David Hill had notice of them at the time of the trade. A question is made by the plaintiff, as to the correctness of this instruction, in relation to notice to his agent being notice to him. It does not appear from the case what was the extent of David Hill's authority to act for the plaintiff in the purchase of the horse, whether he had authority to complete the purchase or not, but it appears that he was more than a mere messenger to receive proposals; he fully negotiated a trade, and paid what was to be a part of the price, if the plaintiff approved of the trade ; and the bargain was completed substantially upon the terms the agent had agreed upon. The closing of the trade by the plaintiff was a consummation of the negotiation by David Hill with the defendant, an acceptance by him of the terms they had agreed upon. David Hill then stood in the place of the plaintiff during the whole negotiation, and what was communicated to him in the course of it, and as a part of it, we think was the same as if the plaintiff had conducted the negotiation in person, and himself received the same information his agent did. The instruction so far we regard correct.

The more important question in the case arises upon the other points of this branch of the charge, in the condition of the evidence on the subject ; that as David Hill saw the quarter

crack, and the bunch on the fore leg of the horse during the nego-
tiation, and before the sale and warranty, they should be
wholly laid out of the case.

The express contract of general warranty of soundness in
terms covers every existing unsoundness, whether known by the
parties at the time of the horse trade or not. It seems some-
what anomalous to make the liability of a party upon an express
contract, for a breach of it, to depend upon the fact, whether
the party taking such contract, knew at the time that the party
was contracting what he could not perform.. But it seems to
have been established from the earliest history of this class of
actions, that a general warranty does not cover defects that are
perfectly visible, and obvious to the senses, and known to the
party taking the warranty. The illustration generally given in
the old books is the sale of a horse with a general warranty of
soundness, which has lost one eye, or an ear, or a tail. The
reason given why the general warranty does not cover such
defects, is because it is presumed that they are not intended to
be included in the warranty, being fully known to the parties at
the time.

, The county court held that this principle applied to this case
as to the quarter cracks and bunch on the leg. Was this cor-
rect ? It was conceded that these defects, so far as they were
obvious and visible, were known to the plaintiff, or his agent.
So far as the quarter cracks are concerned, there would seem to
be but little ground, if any, to find fault with it. The plaintiff's
agent saw and examined them, and told the defendant, he did not
care much about them as they could be cured, and the plaintiff
proved that they were cured in about a year. It does not appear
but that they were cured as soon as he supposed they could be,
or that this defect .proved to be any different or greater, than
was apparent to the agent's observation at the time.

The plaintiff's agent also saw the bunch on the fore leg. He
testified that it was spoken of between him and the defendant at
the time, and that the defendant said it had always been there,
but did not injure the horse. The defendant testified that the
bunch made its appearance when the horse was about two years
old, that it was very small, not larger than a pea, not readily

discoverable, and had never in the slightest degree injured or affected the horse in any manner, and that he so informed the plaintiff's agent. It does not appear from the case that the plaintiff's agent believed or had any reason to believe at the time, that the bunch was anything more than a mere blemish, which would never render the horse less capable for use or service. The plaintiff gave evidence tending to prove that in fact the bunch was an unnatural deposit of bone, that it constituted an unsoundness in the horse at the time of the sale, and that it affected the walking of the horse, and created a weakness in the joint. Now, conceding that the jury should find the facts proved, in relation to the real character and consequences of this bunch, as the testimony tended to show, (and the plaintiff of course had the right to have the case put to the jury as to this,) could it be truly said that the plaintiff's agent had full notice of this unsoundness ? We think not.

It was pointed out to him as a mere blemish, not affecting the real soundness of the horse, and which never had injured him, and from the description of it in the exceptions, probably the most skillful and experienced man could not have determined with certainty which it was. If in truth it was different from what it appeared, and from what the defendant represented and believed it, and was an unsoundness affecting the usefulness and value of the horse, it would be covered by the warranty, and the knowledge which plaintiff had of it, as an entirely different and innocent thing, would not prevent it. This bunch on the horse's leg was one of those equivocal defects that a warranty is taken to guard against by the purchaser.

The rule excluding from a warranty such defects as are known to the purchaser, only applies to such as are perfectly obvious to the senses, and the effects and consequences of which may be accurately estimated, so that no purchaser would expect the seller intended to warrant against them.

All other defects, though apparent to some extent, but still equivocal and doubtful in their character, whether they are permanent or temporary, or whether they are mere harmless blemishes or but partially developed unsoundness, must be understood to be included and covered by a general warranty; and

warranties are usually asked and given to protect purchasers against the risk presented by such cases.

We are of opinion, therefore, that the court erred in withdrawing this part of the case from the jury, but that the evidence should have been left to them to find, whether this bunch was what it was represented and understood to be at the time of the sale, or whether it was an unsoundness affecting the horse, as the plaintiff claimed it to be, and if the latter, that it would entitle the plaintiff to recover.

We are of opinion also that there was error in excluding what the plaintiff said to Williamson when he hir.d. and returned his horse as to the business he was going to Bridport upon, and what he had been there for. It was offered merely to identify this time of hiring as the one when he made the trade with the defendant, like fixing a date. For this purpose it is common to allow witnesses to refer to what third persons have said, to their having heard of a particular event, &c., to fix the time. Here, coupling what the plaintiff said with the fact of his having the team and making the journey, the declarations and the acts, it was competent evidence to identify this occasion with the purchase of the horse. It is impossible to suppose the plaintiff could have had it in mind then to be making evidence to aid him in a controversy with the defendant, or any one; it was the ordinary, almost involuntary, utterance of a concurrent transaction. If on that day some third person had told Williamson he had been present and seen plaintiff purchase defendant's horse on that day, it would be competent evidence as identifying this occasion as the day he bought the horse.

The early case of *Ross* v. *Bank of Burlington*, 1 Aik. 43, goes much farther than this in the admission of this kind of evidence.

The judgment is reversed and case remanded for a new trial.